IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RASHAD HAKEEM WILLIAMS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BETH A. HART, ASHWIN ) <br> JAYACHANDRAN, M.D., and DAVID ) <br> MANSFIELD, ) <br> ) <br> Defendants. ) <br> ) | No. 19 C 581 <br><br> Judge Virginia M. Kendall |

Plaintiff Rashad Williams sued Defendants Beth Hart, David Mansfield, and Dr. Ashwin Jayachandran under 42 U.S.C. § 1983 for violating his due-process rights by administering psychotropic medication against his will while incarcerated at Stateville Correctional Center. (Dkt. 12). Defendants Hart and Mansfield (together, the "IDOC defendants") moved for summary judgment, (dkt. 74), and Defendant Dr. Jayachandran individually moved for summary judgment. (Dkt. 77). For the following reasons, the Court grants both motions.

## Background

Plaintiff Rashad Williams was incarcerated at Stateville Correctional Center ("Stateville") from December 8, 2016 until April 3, 2017. (Dkt. 81 ¶ 1; Dkt. 83 ¶ 1; Dkt. 83 ¶ 64). Plaintiff is currently being housed in the Cook County Jail on charges of first-degree murder, attempted murder, and unlawful possession of a firearm. (*See* Dkt. 76-5 at 7:23-24, 8:1-24, 9:1-20). Soon after Williams's arrival at Stateville, treating psychiatrist Dr. Hosain Manesh conducted a mental-health evaluation. (Dkt. 83 ¶ 17; Dkt. 86-1 at 21–30). Dr. Manesh diagnosed Williams with an unspecified psychotic disorder and noted recent history of suicide, "vague"

1

current suicidal ideations, and thoughts of harming others. (Dkt. 83 ¶¶ 18–20; Dkt. 86-1 at 21). Dr. Manesh placed Williams on 15-minute close supervision for several weeks. (Dkt. 83 ¶ 20; Dkt. 86-1 at 21). Williams was again placed on close watch for several days in January after threatening to swallow twenty pills. (Dkt. 83 ¶ 21). He was on close watch for the last few days in February due to suicidal ideations. (*Id.* ¶ 22). Williams remained on close watch from March 3–March 16 due to delusional thoughts, as well as paranoid and suicidal ideations. (*Id.* ¶ 23).

Plaintiff has been treated for severe mental health issues during this entire time in custody due to threats and acts of harm towards himself and others, auditory and visual hallucinations, and noncompliance with psychotropic medications. (*Id.* ¶¶ 6–27). Plaintiff believes he hears voices; that these voices are real, and not a result of any mental health issues. (*Id.* ¶¶ 6–9). Plaintiff has told several mental health professionals at Stateville that Lucifer, the devil, talks to him; and that he can read other people's minds. (*Id.* ¶¶ 13–14). Plaintiff further reported that he believes "death is freedom" to his treating mental health professionals. (*Id.* ¶¶ 9–10).

On January 7, 2016, while on crisis watch, Plaintiff made the following statement to a treator:

> I don't know what to do, when I tell people I have special powers, they don't believe me. You know I have the cure to cancer. I know where the atomic bombs is. And time is of the essence. I can see the future. I see what others don't see. Everything is in 3s, even the last three numbers of my Social Security Number, 666, the sign of Lucifer. . . Or I could kill myself, but I want to live for my daughter. (*Id.* ¶ 11).

At his deposition, Plaintiff admitted to misleading his treating mental health professionals by agreeing to their recommended treatment plans when he never had any intention to do so. (*Id.* ¶¶ 15–16). Plaintiff also admitted he was noncompliant with his psychotropic medication by disposing of it instead of taking it. (*Id.*) Plaintiff underwent several mental health evaluations with his treating psychiatrist, Dr. Husain Manesh. (*Id.* ¶¶ 17–27). Dr. Manesh noted several

2

significant findings, including reported past suicide attempts, suicidal ideations, thoughts of harming others, and non-compliance with medications. (*Id.*) Based upon his mental health issues, Mr. Williams was placed on "close watch" during the majority of his time at Stateville. (*Id.* ¶¶ 21–26).

On March 13, Dr. Manesh re-evaluated Williams's mental health and repeated the psychotic disorder diagnosis. (Dkt. 81 ¶ 12; Dkt. 83 ¶ 24; Dkt. 86-1 at 31). Dr. Manesh's evaluation alluded to a history of noncompliance with taking prescribed medications Zyprex and Remeron. (Dkt. 86-1 at 31). Dr. Manesh noted Williams

> does not present as an acute risk to others, but there is clearly some self harm/safety risk as he expresses thoughts of wishing he were dead without plan or intent. With that said, he will remain on [close watch]. Because he is not a clear or acute danger to self/others and he appears to be caring for himself . . . he does not meet criteria for acute short-term forced medications. With that said, the longer he is unmedicated and his . . . mental health issues worsen, he could become a danger to others as he noted [history] of acting out on himself and others. (*Id.*)

Dr. Manesh then referred Williams to the Treatment Review Committee ("TRC") for a hearing to evaluate the forcible administration of medication because "the processes take time to be completed." (*Id.*; Dkt. 81 ¶ 27). He noted that "should [Williams] comply with treatment AND improve, then those can be cancelled." (Dkt. 86-1 at 31).

At Stateville, there is no standing TRC; it is formed *ad hoc* when an individual is identified who may benefit from enforced medication. (Dkt. 83 ¶ 27). The TRC comprises two members: a mental health professional and a psychiatrist; a correctional counselor designated as the "staff assistant" assists the incarcerated patient. (Dkt. 83 ¶ 28). Defendant Beth Hart, a Licensed Social Worker, and Defendant Dr. Ashwin Jayachandran, a psychiatrist, served on

Williams' TRC, and Defendant David Mansfield, a correctional counselor, served as Williams's designated staff assistant. (Dkt. 81 ¶¶ 2–8; Dkt. 83 ¶¶ 2–4).

The two TRC members and the staff assistant took on specific roles and responsibilities to fulfill the procedural requirements of Illinois's Administrative Code governing the administration of psychotropic medication against an incarcerated patient's will. *See* Ill. Admin. Code tit. 20, § 415.70 (2005). Here, Hart as Chairperson was responsible for ensuring Williams received notice of his TRC hearing at least 24 hours in advance, ensuring the member psychiatrist had the necessary medical history to advise the TRC, reading the initial statement to Williams at the hearing's start, and documenting the proceedings. (Dkt. 83 ¶¶ 29–30). She was also responsible for providing Williams with the TRC's findings and notice of his right to appeal their decision to the facility's Medical Director. (*Id.* ¶ 31). Dr. Jayachandran's role as the member psychiatrist was to provide medical advice after reviewing pertinent mental-health history and medical records. (*Id.* ¶¶ 32, 57). He believed he had no additional procedural responsibilities for the hearing. (*Id.* ¶¶ 31, 33–35). Mansfield, as staff assistant, was responsible for meeting with Williams before the hearing to discuss the procedural and mental-health issues involved, identifying whether any witnesses would be called on Williams's behalf, and serving as Williams's advocate during the hearing to ensure the TRC considered his rights. (*Id.* ¶¶ 36–37, 39). Defendants all received training on the procedural requirements and mental-health issues involved in conducting a TRC hearing. (Dkt. 87 ¶ 2; Dkt. 87 ¶ 2).

A mental-health progress note for Williams dated 3-15-17 with a 10:00 a.m. time notation stated, "[Inmate] seen for daily crisis assessment and served with treatment review committee paperwork. MHP[1] read review paperwork to him. [Inmate] stated 'I don't want to talk to you[.]' MHP attempted to reengage offender several times and have [inmate] sign

---
[1] MHP stands for "mental health professional."

paperwork." (Dkt. 86-1 at 32–33). A TRC Hearing Notice Form identifies Nicole Ramel as the Notice's Serving Employee, with 3/15/17 at 9:38 a.m. as the time and date served. (*Id.* at 34–35). This form indicated "Committed Person Refused to Sign." (*Id.* at 35). Williams does not remember any mental-health professional coming with paperwork or giving him notice of the TRC hearing. (Dkt. 76-5 at 66:15–18). Besides the Notice Form's statements, none of the defendants had personal knowledge of whether Williams received notice of the hearing. (Dkt. 87 ¶¶ 4, 8; Dkt. 88 ¶ 12).

The TRC Hearing Notice Form included a blank space to identify witnesses Williams wanted to attend the hearing on his behalf. (Dkt. 81 ¶ 15; Dkt. 83 ¶ 22). It is standard procedure for the designated staff assistant—here, Mansfield—to meet with the incarcerated patient before a TRC hearing. (Dkt. 81 ¶ 26; Dkt. 83 ¶¶ 39, 50). Mansfield does not remember meeting with Williams before the TRC hearing. (Dkt. 78-5 at 22:15–23:14; Dkt. 87 ¶ 9; Dkt. 88 ¶ 9). Williams said Mansfield never met with him before the TRC hearing or asked him about witnesses. (Dkt. 76-5 at 68:11–18). Had he been asked, Williams said he would have called his former cellmate as a witness. (Dkt. 76-5 at 68:22–69:20).

On March 16, 2017, Hart and Dr. Jayachandran conducted the TRC hearing with Williams and Mansfield present. (Dkt. 81 ¶ 19; Dkt. 83 ¶ 51). Hart, as Chairperson, later wrote up the hearing's proceedings in a TRC Hearing Summary based on notes she took during the hearing. (Dkt. 81 ¶ 25; Dkt. 83 ¶ 53; Dkt. 86-1 at 19–20). When given the opportunity to make an opening statement, Williams "indicated that he did not understand the purpose of the meeting." (Dkt. 86-1 at 19). Hart clarified the reasons why the TRC was considering enforced medication status for Williams, including "hoarding medication, refusing crushed medication, difficulty caring for personal needs, and ongoing delusional thought processes." (*Id.*) Williams,

5

in turn, blamed Hart for these issues because she purportedly had 10 pills and a damaged mattress removed from Williams's crisis cell during a daily assessment the week before. (*Id.*) The TRC Hearing Summary reported Williams expressed violent thoughts, including a desire to kill Hart with a pitchfork, and had no insight into his mental illness or the need for ongoing medical treatment. (*Id.*)

Williams does not remember what happened at the hearing, including whether he had the opportunity to present witnesses. (Dkt. 81-1 at 66:23–67:19, 70:3–71:8). Hart did not recall whether Williams was specifically asked at the hearing if he wanted to call witnesses, (dkt. 78-4 at 31:25–32:8), though Mansfield recalled Hart had asked Williams if he wanted to call any witnesses. (Dkt. 78-5 at 31:3–22). Mansfield did not recall whether he asked Williams if he wanted to call witnesses, nor what Williams's response was to Hart asking. (Dkt. 78-5 at 32:2–15). Dr. Jayachandran did not recall whether Williams was asked if he wanted to call witnesses. (Dkt. 78-3 at 30:1–11). The TRC Hearing Summary indicates that no witnesses were interviewed, with the notation "none requested." (Dkt. 86-1 at 19).

The TRC Hearing Summary reported the committee's conclusion: that Williams suffered from "a serious mental illness, and there is a substantial risk that, if untreated, his condition may result in serious physical harm to himself and/or others." (*Id.* at 20). The TRC also found it was in Williams's best interest to take psychotropic medications and concurred with Dr. Manesh's recommendation to medicate Williams against his will. (*Id.*; *see also id.* at 18).

The day after the hearing, a nurse gave Williams an injection of Haldol[2] over his objection. (Dkt. 83 ¶ 63; Dkt. 81-1 at 78:3–16). After this injection, Williams reported

---

[2] Haldol is a psychotropic medication used to treat schizophrenia and other psychotic mental disorders by altering the brain's chemical balance; if effective, it aids the patient to "organiz[e] his or her thought processes and regain[ ] a rational state of mind." *Sullivan v. Flannigan*, 8 F.3d 591, 592 n.1 (7th Cir. 1993) (citing *Washington v. Harper*, 494 U.S. 210, 214 (1990)). It can also produce side effects such as "insomnia, restlessness, anxiety, drowsiness,

experiencing dizziness, black outs, memory loss, paralysis, and erectile dysfunction, (dkt. 87 ¶ 1; dkt. 88 ¶ 1), though Defendants dispute these symptoms as Haldol side effects. (Dkt. 87 ¶ 1; Dkt. 88 ¶ 1; Dkt. 78-3 at 58:3–24).

The TRC Hearing Summary notes Hart served Williams with the TRC's report on April 3 at 9:00am. (Dkt. 86-1 at 18). This included a notice of Williams's right to appeal the decision to the Medical Director. (*Id.*) But Williams was transferred to Cook County Jail ("CCJ") that same day. (Dkt. 83 ¶ 64). Hart believed Williams could have appealed this decision from CCJ. (Dkt. 78-4 at 79:21–80:19). Williams testified that he wanted to file a grievance after the hearing while he was still at Stateville, but he was not allowed to have pen or paper in the crisis cell, where he remained on close watch after the Haldol injection. (Dkt. 81-1 at 92:8–21; 93:7–94:14). When he arrived at CCJ, he was told he could not grieve an issue from what happened at another facility. (*Id.* at 98:22–93:1).

Williams sued the three defendants in early 2019, (dkt. 1), and amended his complaint in June 2019 after retaining appointed counsel. (Dkt. 12). Defendants moved to dismiss based on Williams's alleged failure to exhaust his administrative remedies, (dkt. 58), which this Court denied after a *Pavey* hearing. (Dkt. 64). Defendants Hart and Mansfield together and Defendant Dr. Jayachandran individually moved for summary judgment. (Dkt. 74; Dkt. 77).

## **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). Summary judgment "requires a non-moving party to respond to the moving party's properly-supported

---

depression, lethargy, confusion, vertigo, seizures, hallucinations, catatonic-like behavior, and 'tardive dyskinesia' (spasms of the neck and face muscles)." *Id.* (citing *Physicians' Desk Reference* at 1422–24 (1993)).

7

motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party receives "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). *See also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." (internal citations omitted)).

## Discussion

### A. Due-Process Rights

The Fourteenth Amendment's Due Process Clause protects incarcerated patients' "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). The State balances this interest against the prison environment's need for safety and order, and the State may medicate an incarcerated patient against his will if he has a serious mental illness, is dangerous to himself or others, and treatment would be in his medical interest. *Id.* at 222–23, 227. But the State cannot decide these issues arbitrarily; rather, the State must afford the incarcerated patient procedural due-process protections of his right to avoid forcible medication. *Id.* at 228.

Illinois adopted rules governing the involuntary medication of incarcerated patients through administrative procedures that closely parallel those *Harper* first approved. *Sullivan v.*

8

*Flannigan*, 8 F.3d 591, 597, 599 (7th Cir. 1993), *cert. denied* 511 U.S. 1007 (1994); *see* Ill. Admin. Code tit. 20, § 415.70 (2005). Illinois prison officials satisfy federal due process by following these procedures. *Sullivan*, 8 F.3d at 599. Incarcerated patients in Illinois only receive non-emergency administration of psychotropic medication against their will after an independent Treatment Review Committee ("TRC") approves this action following a hearing to review the treating physician's initial recommendation. Ill. Admin. Code tit. 20, § 415.70(a)(1)(B).

The TRC procedures mandate two committee members—both mental-health professionals, one of whom is a physician—plus a designated staff assistant to assist the incarcerated patient in representing his interests. § 415.70(b). The procedures state,

> The offender and staff assistant shall receive written notification of the time and place of the hearing at least 24 hours prior to the hearing. The notification shall include the tentative diagnosis and the reasons why the medical staff believes the medication is necessary. The staff assistant shall meet with the offender prior to the hearing to discuss the procedural and mental health issues involved.

§ 415.70(b)(2). The procedures also provide that before the hearing, "witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant," "the offender and staff assistant may request in writing that witnesses be interviewed," and that "the offender and the staff assistant may request in writing that witnesses appear at the hearing." § 415.70(b)(5–7).

Here, Williams does not challenge the medical basis for the decision to administer Haldol. (*See* dkt. 82 at 11 (challenging only Defendants' alleged procedural violations, not whether he was severely mentally ill or treatment was in his best medical interest)). He alleges Defendants violated his due-process rights by failing to afford him the "minimum procedural requirements" spelled out in Section 415.70(b)(2), (5), (6), and (7), before the TRC reached its decision. (Dkt. 12 ¶¶ 29–33, ¶ 41). Due process requires an incarcerated patient has notice of the

9

hearing and its purpose, and a meaningful opportunity to advocate for himself at his hearing. *Harper*, 494 U.S. at 235 ("Absent evidence of resulting bias, or evidence that the actual decision is made before the hearing, allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))); *cf. Vitek v. Jones*, 445 U.S. 480, 494–96 (1980) ("[N]otice is essential to afford the prisoner an opportunity to challenge the contemplated action [to transfer prisoner involuntarily to a mental hospital] and to understand the nature of what is happening to him."). Williams therefore had the right to notice of the TRC hearing and the opportunity "to be able to argue capably before [the TRC] that he does not need forced medication." *Sullivan*, 8 F.3d at 598. "If the state failed to meet [*Harper*'s] requirements in a particular case, the prisoner could argue that he was denied *Harper*'s protections." *Id.*

### B. IDOC Defendants' Motion for Summary Judgment

Defendants Hart and Mansfield (collectively, the "IDOC defendants") claim Williams cannot show he received insufficient procedural protections that violated his due-process rights. (Dkt. 75). Even if they failed to provide Illinois's full procedural protections, the IDOC defendants claim qualified immunity shields them from liability for acts or omissions that did not violate clearly established federal constitutional rights. (*Id.*) The Court considers the relevant procedural rights in turn and whether qualified immunity applies.

#### 1. Notice

Williams cannot overcome the IDOC defendants' documentary evidence that he received at least minimal verbal notice—and an attempt to serve written notice—of the TRC hearing 24 hours in advance. Neither Hart nor Mansfield personally served Williams with the TRC Hearing

Notice nor had personal knowledge that it had been served. (Dkt. 87 ¶¶ 4, 8). But they reasonably relied on statements made by another IDOC mental-health professional, Nicole Ramel, on the TRC Hearing Notice form indicating the time and date she tried to serve Williams with written notice. (Dkt. 86-1 at 34–35); *see Burks v. Raemish*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). The form indicates Williams refused to sign it. (Dkt. 86-1 at 34–35).

Ramel documented her encounter with Williams in a mental-health progress note—annotated at about the same time as the TRC Hearing Notice—explaining Williams had refused to talk with her about the paperwork, but that she read it aloud to him and attempted to reengage him several times to talk about it. (Dkt. 86-1 at 32–33). Williams does not contend any IDOC employee is lying about these documents' contents. He just does not remember any mental-health professional bringing paperwork to him or telling him about the hearing. (Dkt. 76-5 at 66:15–18). Faced with IDOC defendants' documentary evidence,[3] Williams's lack of memory is insufficient for a reasonable jury to find he received no notice of the TRC hearing. *See, e.g.*, *Baines v. Washington*, No. 92-cv-20069, 1995 WL 330634, at *4 (N.D. Ill. June 2, 1995) (finding prison officials' documentary evidence that inmate had been given notice of TRC hearing overcame inmate's denial). Williams cannot complain he received no notice of the TRC hearing pursuant to § 415.70(b)(2) if he refused to engage with the mental-health professional who came to tell him about it and give him the paperwork.

---

[3] Williams objected to Defendants' documents' admissibility as evidence in support of their respective Local Rule 56.1(a)(3) Statements of Fact because they had not been duly authenticated and thus inadmissible as business records under Federal Rule of Evidence 803(6) hearsay exception for business records. (*See* Dkt. 80 at 9; Dkt. 81; Dkt. 82 at 7–9; Dkt. 83). Defendants have cured this issue by authenticating the documents with an affidavit testifying under oath that the records were kept in the regular course of IDOC business by persons with knowledge of the act, event, or condition recorded therein and made at or near the time that the recorded act, event, or condition occurred, or reasonably soon thereafter. (Dkt. 86-1 at 2–3, Declaration of Ava I. Meier). The affidavit reincorporated the documents referenced in Defendants' briefs and statements of fact. The Court finds this satisfies the documents' admissibility as business records and admissible under Federal Rule of Evidence 803(6).

### 2. Opportunity to Argue Capably before TRC

Williams personally argued his interests before the TRC decided to medicate him against his will. (Dkt. 86-1 at 19–20). The parties' dispute comes down to whether he had the opportunity to do so "capably," as *Sullivan* requires, when Williams claims that he had no opportunity to call witnesses and that Mansfield, as staff assistant, did not meet with him before the TRC hearing. *See* 8 F.3d at 598.

Illinois's Administrative Code requires the designated staff assistant to meet with the incarcerated patient before the hearing to discuss its purpose and the issues at stake. *See* Ill. Admin. Code tit. 20, § 415.70(b)(2). In consultation with the staff assistant, the patient can generally call witnesses if he wants. *See* § 415.70(b)(5–7). But even if the Court accepts Williams's version of the facts—that Mansfield never met with him before the hearing, and the TRC never affirmatively informed him either before or during the hearing of the opportunity to call witnesses—prison officials' failure to fulfill Illinois's procedural requirements does not in itself establish a federal due-process violation. The federal due-process rights in this context are not clearly established. The IDOC defendants thus have qualified immunity from such claims.

Qualified immunity shields state officials from personal liability when their actions do not violate clearly established federal statutory or constitutional rights that they reasonably should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For official action to violate a clearly established constitutional right, "[t]he right must have been concrete enough to notify potential defendants that their conduct was probably unlawful." *Sullivan*, 8 F.3d at 595. The "contours of the right must be sufficiently clear" for reasonable officials to know their actions were probably unlawful. *Anderson v. Creighton*, 482 U.S. 635, 640 (1987). Courts may determine whether federal constitutional rights were clearly established before determining

whether an unreasonable violation of that right occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

State administrative code does not define the contours of federal constitutional rights. *Owens v. Funk*, 760 F. App'x 439, 443 (7th Cir. 2019) ("A violation of prison rules does not, without more, offend the Constitution."); *Fuller v. Dillon*, 236 F.3d 876, 880 (7th Cir. 2001) ("[F]ailure of the prison officials to follow state administrative rules is not a denial, in and of itself, of one's due process rights."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law [or state code] is not a denial of due process, even if the state law confers a procedural right."). Therefore, Williams's due-process rights *do not* "turn[ ] on Defendants' compliance with the requirements of Section 415.70," as he claims. (Dkt. 80 at 4). They turn on whether he received the minimum federal due-process protections, established under *Harper*, *Sullivan*, and their progeny.

*Harper* generally approved a state policy that included, among other things, the right to present and cross-examine witnesses at a hearing, but *Harper* said nothing of whether this was a minimal procedural right in itself. *Harper*, 494 U.S. at 235. Under *Harper*, "allowing respondent to contest the staff's position at the hearing satisfies the requirement that the opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Id.* (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). *Sullivan* further explains that to fulfill *Harper*'s procedural protections, the incarcerated patient "must be able to argue capably" before the TRC that he does not need forced medication. *Sullivan*, 8 F.3d at 598.

The precise contours of this right are far from clear. *See Perry v. Sims*, 990 F.3d 505, 512 (7th Cir. 2021) ("[O]ur prior cases have not elaborated in detail what it means for a prisoner to 'argue capably' as required by *Harper* . . . ."). But the Seventh Circuit has never held that the

13

lack of opportunity to present witnesses—much less the lack of affirmatively provided information about such an opportunity—at a TRC hearing violated an incarcerated patient's due-process right to argue his own interests capably before the TRC, particularly when he appeared and argued his case. *See Perry*, 990 F.3d at 512 (rejecting prisoner's claim of procedural-rights violation when he "had no chance at the hearing to present and cross-examine witnesses" without showing TRC had denied any affirmative request); *see also Fuller*, 236 F.3d at 882 (holding prisoner received due process when he presented his own case before TRC). Without higher authority holding that federal due process affords the incarcerated patient both the right to present witnesses at his TRC hearing and to be affirmatively informed of such a right, this right is not clearly established under federal law. Thus, the IDOC defendants cannot be held liable for failing to ensure Williams knew he had the opportunity to present witnesses. They are qualifiedly immune from this claim.

Likewise, there is no clearly established federal right for the incarcerated patient to meet in advance of the TRC hearing with a prison official—here, the designated staff assistant under Section 415.70(b)(2)—to help him prepare for it. *Harper* held "the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection" for the incarcerated patient's due-process rights. *See* 494 U.S. at 236. The parties do not dispute that Mansfield served as Williams's staff assistant to represent his interests during the TRC hearing. (Dkt. 81 ¶ 8). Williams alleges only that Mansfield failed to meet with Williams beforehand. No Seventh Circuit case addresses the staff assistant's role in the context of the incarcerated patient's right to argue capably his own case before the TRC. To the extent the staff assistant's meeting with the incarcerated patient would give him notice of the hearing, Williams had notice,

14

as explained above. With no clearly established federal procedural right to an advance meeting with a lay adviser, the IDOC defendants are also qualifiedly immune from this claim.

Williams may have had a viable claim that one or both of the IDOC defendants violated his procedural due-process rights under Illinois law, but he has forfeited any such state-law claim in this action because his complaint does not address it.

Therefore, the Court grants the IDOC defendants' Motion for Summary Judgment. (Dkt. 74). Defendants provided sufficient evidence that no reasonable jury could conclude Williams received no notice of the TRC hearing as § 415.70(b)(2) required. Further, the IDOC defendants succeed on their qualified-immunity defense that Williams had no clearly established federal due-process right to the opportunity to present witnesses on his behalf at the hearing, nor to meet with a prison official beforehand to discuss the hearing or calling witnesses.

### C. Defendant Dr. Jayachandran's Motion for Summary Judgment

Defendant Dr. Jayachandran moves for summary judgment, arguing both that Williams cannot show sufficient evidence that a constitutional violation occurred, and that even if he can, Dr. Jayachandran personally violated no procedural due-process rights because they were others' responsibility. (Dkt. 77). Dr. Jayachandran, a private employee of Wexford Health Sources, Inc., can be held liable in his individual capacity under Section 1983 for violating an incarcerated patient's constitutional rights while acting under the color of state law in the same manner as public employees. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Dr. Jayachandran, however, cannot raise the qualified-immunity defense. *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016) (citing *Shields*, 746 F.3d at 794). Williams makes the same claims against Dr. Jayachandran as those against the IDOC defendants: that he had no notice, no

15

opportunity to present witnesses, and no meeting with his designated staff assistant before the TRC hearing.

As to Williams's notice of the hearing, Dr. Jayachandran relies on the same evidence as the IDOC defendants, (*see* dkt. 77 at 9), and with the same result. Though he neither served written notice on Williams nor had personal knowledge that notice was served, (dkt. 88 ¶ 12), Dr. Jayachandran relied on the TRC Hearing Notice signed by Ramel attesting to her attempt to serve written notice and Williams's refusal to sign. (Dkt. 86-1 at 34–35). The mental-health progress note further corroborates Defendants' evidence that Williams received notice, (dkt. 86-1 at 32–33), even if he refused to acknowledge it at the time or did not later recall it happening. (Dkt. 76-5 at 66:15–18). Williams cannot overcome this documentary evidence that he received notice of the TRC hearing, nor does he present any evidence to dispute it.

Regarding Williams's allegations that he was not informed of the opportunity to present witnesses and that he received no visit from the designated staff assistant before the hearing, no reasonable jury could hold Dr. Jayachandran liable for any such procedural failures even if they happened. Williams cannot show that Dr. Jayachandran was personally involved in any of these alleged constitutional violations, as required for Section 1983 liability to attach to him.

The Illinois Code mandates the TRC "shall be comprised of two members . . . both of whom shall be mental health professionals and one of whom shall be a physician." § 415.70(b). Separate from the TRC, and not a member of it, "The Chief Administrative Officer shall designate a member of the program staff not involved in the current decision to order medication to assist the offender. The staff assistant shall have completed a training program in the procedural and mental health issues involved . . . ." § 415.70(b)(1). The Code further requires: that "[t]he staff assistant shall meet with the offender prior to the hearing to discuss the

16

procedural and mental health issues involved," § 415.70(b)(2); that "[p]rior to the hearing, witnesses identified by the offender and the staff assistant may be interviewed by the staff assistant after consultation with the offender . . . ," § 415.70(b)(5); that "[p]rior to the hearing, the offender and the staff assistant may request in writing that witnesses be interviewed by the Committee . . . ," § 415.70(b)(6); and that "[p]rior to the hearing, the offender and the staff assistant may request in writing that witnesses appear at the hearing." § 415.70(b)(7).

The Code clearly implicates only the staff assistant as responsible for meeting before the hearing with the incarcerated patient and discussing the presentation of witnesses. Should witnesses be identified, the members of the TRC shall interview them. *See* § 415.70(b)(6), (7), (9). But the Code assigns no responsibility to the two TRC members for carrying out or overseeing the staff assistant's procedural responsibilities. Here, TRC member psychiatrist Dr. Jayachandran's role was to provide independent medical advice on the case, including reviewing pertinent mental-health and medical records before the hearing. (Dkt. 83 ¶¶ 32, 57). Mansfield testified it was his (Mansfield's) responsibility as designated staff assistant to meet with Williams before the TRC hearing and determine whether witnesses would be called. (Dkt. 83 ¶¶ 36–37, 39). Mansfield testified Dr. Jayachandran had no responsibility to meet Williams before the hearing, nor to determine whether any witnesses would be called. (Dkt. 83 ¶¶ 38, 40).

Williams argues that as a member of the TRC, Dr. Jayachandran bears joint liability for ensuring that the procedural requirements were carried out by all its members. (Dkt. 82 at 9–11). He claims the text of Section 415.70 suggests a collective responsibility on the part of all TRC members for each other's acts or omissions. (*Id.*) But the staff assistant is *not* a TRC member. The Code clearly delineates an important but separate procedural role for the staff assistant as the lay adviser to assist the incarcerated patient in protecting his interests. § 415.70(b)(1). The only

17

members of the two-person TRC are the Chairperson and the physician, who together review the medical recommendation of the treating physician, conduct the TRC hearing, and—at the staff assistant or the incarcerated patient's request—interview previously identified witnesses. § 415.70(b). The two TRC members then consider all information presented and reach a conclusion. § 415.70(b)(9–11). There is no basis in the Code's text to hold a TRC member liable for procedural failures for which the staff assistant and not a TRC member was solely responsible.

Nor can Williams claim that Dr. Jayachandran was somehow either jointly and severally liable or vicariously liable for any failure on Defendant Mansfield's part to carry out the staff assistant's procedural responsibilities. Defendants can only be held liable under Section 1983 for the constitutional violations they caused, demonstrably acquiesced to, or were personally involved in. *Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th Cir. 2022); *see also Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) ("Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." (internal citations omitted)). To be held jointly and severally liable with co-Defendant(s) for a "common plan or design to commit a tortious act," Williams would still have to show Dr. Jayachandran personally deprived Williams of a constitutional right in some way. *Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005). Williams provided no evidence Dr. Jayachandran acted in concert with Mansfield to prevent him from meeting in advance with Williams and discussing the hearing or presentation of witnesses. No evidence shows Dr. Jayachandran acted during the TRC hearing to prevent any witnesses from being called.

To invoke Dr. Jayachandran's vicarious liability, Williams would have to show Dr. Jayachandran both knew about Mansfield's failure to meet with Williams and the failure to

discuss presentation of witnesses, and that Dr. Jayachandran "facilitate[d], approve[d], condone[d], or turn[ed] a blind eye toward it." *Gonzalez*, 40 F.4th at 828. Liability would not attach if Dr. Jayachandran were merely negligent in overseeing another prison official's responsibilities, assuming he had any supervisory authority. *Id.* Again, no evidence shows Dr. Jayachandran had any personal knowledge Mansfield may have failed to meet with Williams or identify witnesses—he assumed the others involved in the hearing were performing their responsibilities. (Dkt. 83 ¶ 46). Because the TRC Hearing Summary stated, "Mr. Williams did not request any witnesses," (dkt. 86-1 at 19), Dr. Jayachandran had no reason to question whether Mansfield had actually consulted with Williams about presenting witnesses. Even if he knew Mansfield never met with Williams, Williams has no evidence showing Dr. Jayachandran "facilitate[d], approve[d], condone[d], or turn[ed] a blind eye toward it." *Gonzalez*, 40 F.4th at 828.

Therefore, no reasonable jury could find that Dr. Jayachandran personally violated Williams's due-process rights for failing to carry out Section 415.70 procedures. The documentary evidence shows Williams received notice, and Williams cannot hold Dr. Jayachandran responsible for any procedural rights violations that the staff assistant may have caused. The Court grants Defendant Dr. Jayachandran's Motion for Summary Judgment. (Dkt. 77).

## Conclusion

Williams cannot survive summary judgment on his claims against all Defendants that he received no written notice of his TRC hearing when Defendants' corroborated documentary evidence shows an IDOC employee tried to serve him with the paperwork, but he refused to acknowledge it and later could not remember if it happened. The IDOC defendants are

19

qualifiedly immune from claims they violated Williams's procedural due-process right to an advance meeting with a staff assistant because this right is not clearly established under federal law. Similarly, they are qualifiedly immune from claims Williams had no opportunity to present witnesses, as this right is not clearly established under federal law. Defendant Dr. Jayachandran cannot be held liable under Section 1983 for any alleged deprivation of constitutional rights that he neither caused nor was personally involved in.

The Court grants Defendants Hart and Mansfield's Motion for Summary Judgment and Defendant Dr. Jayachandran's Motion for Summary Judgment.

Date: September 29, 2022

_____
Virginia M. Kendall
United States District Judge